In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2439

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LESLIE C. MAYFIELD,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 687-1 — **Harry D. Leinenweber**, *Judge*.

ARGUED APRIL 16, 2013 — DECIDED NOVEMBER 13, 2014

Before WOOD, *Chief Judge*, and BAUER, POSNER,
EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, TINDER, and
HAMILTON, *Circuit Judges*.[*]

SYKES, *Circuit Judge*. Leslie Mayfield was indicted for
conspiring with a coworker and a drug courier to rob a stash
house controlled by the courier's suppliers. The conspiracy was
a setup; the drug courier was an undercover government agent

---

[*] Circuit Judge Joel M. Flaum took no part in the consideration or decision
of this case.

and the coworker was an informant. At his trial Mayfield wanted to present a defense of entrapment, but the government opposed it and moved in limine to preclude the defense, arguing that there wasn't enough evidence to show that the government induced the crime or that Mayfield lacked the predisposition to commit it. Mayfield responded with a narrative of the informant's persistent campaign to secure his participation in the stash-house robbery and his repeated resistance to the scheme. The district court granted the government's motion and barred the defense. The jury, uninstructed on the entrapment issue, convicted Mayfield of several federal crimes stemming from the conspiracy.

A divided panel of this court affirmed, *see United States v. Kindle*, 698 F.3d 401 (7th Cir. 2012), and a petition for rehearing en banc followed. Recognizing some confusion in our entrapment jurisprudence, we granted rehearing en banc to clarify the doctrine both substantively and procedurally.

Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it. The two elements of the defense—lack of predisposition and government inducement—are conceptually related but formally and temporally distinct. We define the two elements here and resolve some conflicting strains in our caselaw about the relationship between them.

Procedurally, the entrapment defense is an issue of fact for the jury. The defendant is entitled to an entrapment jury instruction if he can show that some evidence supports both

elements of the defense. When the issue is raised before trial on the government's motion to preclude the defense, the court must accept the defendant's factual proffer as true and not weigh the evidence against the government's counterstatement of the facts.

Here, Mayfield proffered enough evidence to justify giving the issue to the jury. He provided some facts showing that he was not predisposed to commit the charged crimes prior to being approached by the informant, and he narrated a story of substantial government inducement going beyond the mere offer of a chance to rob a stash house. His story may be false or unpersuasive, but that's for the jury to decide. The district court erred by crediting the government's evidence over Mayfield's and precluding the entrapment defense before trial. We vacate the judgment and remand for a new trial.

## I. Background

We take the facts from Mayfield's pretrial proffer (most of which was excluded pretrial) and the evidence introduced at trial. Mayfield was convicted of residential burglary in 1987 at age 18 and served time in jail for this crime. In 1994 he was convicted of several violent crimes stemming from an armed carjacking; he received a lengthy prison sentence. While in prison he earned a GED, an associate degree in general studies, and vocational certificates in commercial custodial services and cosmetology. He was released in 2005 and returned home to Waukegan, Illinois, where he participated in the Second Chance Program operated by the Urban League of Lake

County, the Waukegan Township Coalition to Reduce Recidivism, and Cease Fire Waukegan.

But not all was well. At some point after his release from prison (we don't know exactly when), Mayfield was charged with unlawful possession of a firearm. That prosecution was still pending when the events in this case took place. In 2008 he moved with his fiancée from Waukegan to Naperville, ostensibly to escape gang violence.

Although jobs for convicted felons were hard to come by, Mayfield managed to find sporadic work. After moving to Naperville, he found a temporary job in nearby Bolingbrook that allowed him to work a 40-hour workweek. He started this new job in late April or early May of 2009 and soon thereafter met Jeffrey Potts, a coworker with whom he had much in common. Potts was also a felon with convictions for drug trafficking, robbery, and gun possession. The two men commiserated about their financial straits, their difficulty finding permanent jobs, and their struggle to support their families. What Mayfield did not know was that his new friend was supplementing his income as a confidential informant for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").[1]

As an informant Potts was supposed to identify targets for sting operations and, as in this case, participate in the stings.

---

[1] This can be surprisingly lucrative. *See, e.g.*, *United States v. Estrada*, 256 F.3d 466, 469 (7th Cir. 2001) (describing a DEA agreement to pay an informant 25% of the proceeds of sting operations he helped orchestrate, which totaled more than $400,000).

He selected Mayfield as a target because he knew that Mayfield had a criminal record.[2] What followed, according to Mayfield, was a concerted effort to entrap him into committing a stash-house robbery.

In his first overture to Mayfield, Potts explained that he had returned to selling cocaine and invited Mayfield to join him in the drug trade. Mayfield rebuffed this offer. A few days later Potts learned that Mayfield had a pending gun-possession charge, so he tried another tack. He told Mayfield of a one-time opportunity "that was worth a lot of money." His drug supplier was planning to "stickup" his wholesaler, a robbery that would net tens of thousands of dollars in cocaine. Potts invited Mayfield to participate in the robbery in return for a share of the profits. Mayfield rejected the invitation.

Potts persisted. Each day at work he tried to persuade Mayfield to join the conspiracy by appealing to his concerns about money. He urged Mayfield to think about the financial needs of his family, saying "I know you [are] tired of working for this chump change" and "I know you need this money," among other similar lines of persuasion. Potts also flaunted his expensive Dodge Ram pickup truck, telling Mayfield that he bought it with $40,000 he had "earned" in another drug robbery. Mayfield continued to decline the offers.

On June 25, 2009, Mayfield's car was damaged in an accident. He borrowed money from a family member to have the car towed but did not have enough to pay for the needed

---

[2] At oral argument the government told us that Mayfield was not on ATF's radar prior to Potts's identification of him as a target.

repairs. He missed three days of work before he found another way to get to his job in Bolingbrook. When Potts asked him why he had missed work, Mayfield told him about the accident and explained his financial predicament. Potts unexpectedly gave him $180 in cash to pay for the car repairs.

Two days later Potts returned to the subject of the stash-house robbery, again pressuring Mayfield to join the conspiracy. Mayfield equivocated but did not agree to anything. The following week Potts tried again. When Mayfield continued to resist, Potts gestured to a Gangster Disciples tattoo on Mayfield's arm. The tattoo dated from Mayfield's membership in the street gang before his carjacking conviction; he knew that failure to repay a debt risked harsh punishment from the gang. When Potts said he was still associated with the Gangster Disciples, Mayfield took it as a warning that he would be in danger if he did not quickly pay up. By the end of the day, Mayfield agreed to participate in the stash-house robbery conspiracy.

According to the standard ATF script for the sting, a fictional drug courier was disgruntled with his organization and wanted to rob one of its stash houses. Mayfield was to meet with the courier to discuss logistics, then recruit a crew, gather weapons, and help the courier carry out the robbery. Mayfield contends that because he was still reluctant to participate, Potts went off script and instead urged him to play along with the plan to rob the stash house but at the last minute rob *the courier* instead, which would be a less risky way to repay the debt—or at least not as dangerous as running into a guarded stash house.

Potts and Mayfield met with the "drug courier"—actually undercover Special Agent Dave Gomez—on July 23, 2009. Depending on whose version is believed, this meeting involved not one but *two* setups: Gomez and Potts were setting up Mayfield for prosecution; Mayfield and Potts were setting up Gomez for a robbery. Gomez told the pair that he normally received instructions to transport cocaine about once a month and that the shipments typically involved six to eight kilograms. He also said his organization typically kept 20 to 30 kilograms at its guarded stash houses, the locations of which were kept secret until just before the transport.

Recordings of this meeting indicate that Mayfield helped plan the robbery. He told Gomez that he had experience in knocking off stash houses but had not done a robbery quite like this one before. He said he felt like he was going in blind and suggested that the "element of surprise" would be essential. He assured Gomez that the people he was going to recruit were "for real" and agreed to gather the guns, bullet-proof vests, and other equipment for the robbery. Mayfield claims it was all a bluff.

On July 27, 2009, Gomez and Mayfield spoke again by phone, and Mayfield reported that his recruits were ready to meet. Gomez and Mayfield kept in touch by phone for about two weeks, and the next meeting took place on August 9, 2009. Mayfield brought along Montreece Kindle, who in turn brought Nathan Ward and a person known only as "New York." The group went over the strategy and logistics of the operation. Mayfield again emphasized the need for surprise. Kindle, "New York," and Gomez discussed the possibility that

the guards at the stash house might have to be killed. "New York" bragged about his ability to distribute the cocaine obtained in the robbery. Gomez asked the group if the robbery was too much for them to handle. "New York" and Kindle said it was not. Finally, Gomez made clear that if they thought they couldn't handle the job, they could call it off.

Mayfield claims that after the meeting with Gomez, he informed his crew that the actual plan was to rob Gomez, not the stash house, and that they were to play along to dupe him into believing that they were serious about the stash-house robbery. Later that evening Gomez called Mayfield to let him know the robbery would happen the following night. Mayfield then called Potts, ostensibly to say he was prepared to rob Gomez to settle the debt and be done with the whole affair. Potts did not answer the call.

Mayfield tried again to reach Potts the next day, and again Potts did not answer the call. Mayfield then called a friend, Dwayne White, who agreed to come meet him. White had no transportation, so Mayfield arranged for Kindle and Ward to pick him up. White, Kindle, and Ward met at Mayfield's apartment, and the group drove in Ward's van to meet Gomez in a parking lot in Aurora, Illinois, the prearranged meeting spot.

Gomez was waiting in the parking lot in a Cadillac Escalade. Mayfield got out of the van to speak with Gomez, who explained that he planned to get out of town right after the robbery but wanted his share of the cocaine placed in a storage locker. Gomez told Mayfield to get into the Escalade so he could show him the location of the storage facility. The two

men left the parking lot in the Escalade, with White, Kindle, and Ward following behind in Ward's van.

When they arrived at the storage facility, all five men got out of their vehicles. Gomez then noticed White, whom he had not met before. Mayfield said that White was his little brother and assured Gomez that he was "100." Gomez asked White whether he understood the plan to rob a stash house, and White said he did. Gomez then asked if everyone was ready. When he got a positive response, he gave the arrest signal. ATF agents swarmed the scene and arrested the four men. Inside Ward's van agents discovered a sawed-off shotgun, a .40-caliber Glock semiautomatic pistol, a .44-caliber revolver, two bulletproof vests, and a duffel bag large enough to hold 25 to 30 kilograms of cocaine. They also recovered a .357 Magnum revolver from Gomez's Escalade, apparently tossed there by Mayfield after he saw Gomez give the arrest signal.

Mayfield and the others were charged with conspiracy and attempt to distribute cocaine, *see* 21 U.S.C. § 846, possession of a firearm in connection with a drug crime, *see* 18 U.S.C. § 924(c)(1)(A), and possession of a firearm by a felon, *see id.* § 922(g)(1). The case against Mayfield, White, and Ward proceeded to trial before the same jury; the charges against Kindle were tried separately because he had given a postarrest statement that inculpated the others. The government moved in limine to prevent Mayfield from presenting an entrapment defense, arguing that the following evidence established his predisposition as a matter of law: (1) his criminal record; (2) his recorded statements to Gomez that he had committed similar stash-house robberies; (3) his extensive preparation and arsenal

at the time of arrest; and (4) his failure to abort the plan when Gomez gave him the opportunity.

Mayfield opposed the government's motion with a formal response and a six-page handwritten "statement of fact." Together, these two documents amounted to a proffer on Mayfield's entrapment defense and narrated the events we have recounted above. The proffer's description of the interactions between Potts and Mayfield is reasonably detailed, emphasizing that Mayfield repeatedly rebuffed Potts's advances and that Potts played on Mayfield's indebtedness and Potts's affiliation with the Gangster Disciples. The description of the planning and execution of the robbery scheme is more cursory, but the proffer indicates that Potts coached Mayfield on what to say at the various meetings with Gomez and provided the weapons for use in the robbery. (The government denies this, of course.) Mayfield's initial proffer addressed only the issue of inducement; he took the position that once a defendant has presented sufficient evidence of government inducement, the burden shifts to the government to convince the jury beyond a reasonable doubt either that its agents did not induce the crime or that the defendant was predisposed to commit it.

The district court granted the government's motion and precluded the entrapment defense. Mayfield moved for reconsideration, this time addressing the issue of predisposition directly. He proffered evidence of his efforts to rehabilitate himself while in prison, his ongoing participation in antirecidivist programs, and his employment history after his release. He also provided more detail about Potts's repeated efforts to

induce his participation in the crime, explaining that he resisted his friend's overtures for weeks and only agreed to get involved in response to Potts's persuasion at a moment of financial need. The government continued to oppose the defense. The judge reiterated his earlier ruling precluding the defense.

Mayfield was convicted on all counts, and the judge sentenced him to a whopping 322 months in prison. A divided panel of this court affirmed. The panel majority concluded that the judge properly excluded the entrapment defense because Mayfield ultimately accepted the government's offer to participate in the robbery, which though perhaps routine as stash-house robberies go was nonetheless highly dangerous. *See Kindle*, 698 F.3d at 408–09. The majority reasoned that only a person already predisposed to such a risky crime would choose to participate, so Mayfield must have been predisposed. *Id.* Judge Posner dissented, concluding that Mayfield offered enough evidence to get his entrapment defense before the jury. *Id.* at 412–16 (Posner, J., dissenting). We granted rehearing en banc.[3]

---

[3] Kindle, Ward, and White also appealed, and their appeals were consolidated with Mayfield's. The panel unanimously rejected the codefendants' challenges to their convictions. *See United States v. Kindle*, 698 F.3d 401, 406–08, 412 (7th Cir. 2012). We granted rehearing en banc solely on the issue of Mayfield's entrapment defense, so we now reinstate the panel opinion to the extent that it resolved the appeals of the codefendants.

## II. Discussion

Some of our recent entrapment cases have given conflicting signals about the substance of the defense, the procedure for raising and presenting it, and the quantum of evidence necessary to get the issue before the jury. The government commonly seeks to block the defense before trial, proffering evidence that its agents did not induce the crime, the defendant was predisposed to commit it, or both. These are the two formal elements of entrapment, but our circuit's caselaw could be clearer about the relationship between them and what the defendant must do to overcome the government's motion in limine to preclude the defense at trial. To that end, we begin with some history.

### A. History

Entrapment is a relative newcomer to the catalog of criminal defenses. It's not just that the defense is new; it's that entrapment-like *activity* is new, having arisen as law enforcement professionalized and developed techniques of artifice and deception in the pursuit of criminals. Still, courts were slow to recognize entrapment as a defense to criminal liability. This statement from a nineteenth century state appellate decision colorfully captures the judiciary's resistance:

> Even if inducements to commit crime could be assumed to exist in this case, the allegation of the defendant would be but the repetition of the plea as ancient as the world, and first interposed in Paradise: "The serpent beguiled me and I did

> eat." That defence was overruled by the great
> Lawgiver, and whatever estimate we may form,
> or whatever judgment pass upon the character
> or conduct of the tempter, this plea has never
> since availed to shield crime or give indemnity to
> the culprit, and it is safe to say that under any
> code of civilized, not to say christian ethics, it
> never will.

*Bd. of Comm'rs of Excise of Onondaga Cnty. v. Backus*, 29 How. Pr. 33, 42, 1864 WL 3628, at *6 (N.Y. 1864). By the turn of the twentieth century, however, state courts and lower federal courts had begun to recognize some form of an entrapment defense. The Supreme Court eventually followed suit.

### 1. *Adoption*

The Supreme Court's first significant encounter with the entrapment defense came in *Casey v. United States*, 276 U.S. 413 (1928). When jail officials suspected a lawyer of smuggling narcotics into the jail for his clients, they laid a trap. They recruited a prisoner and instructed him to summon the lawyer and offer him $20 in exchange for a delivery of morphine. The lawyer made the deal and smuggled the drug in. A jury convicted him of drug trafficking, and his case made its way to the Supreme Court. In the view of a majority of the justices, entrapment wasn't properly before the Court. Writing for the majority, Justice Holmes intimated that a defense of entrapment might be available in an appropriate case, but held that

the Court should not rule on the issue on its own initiative. *Id.* at 418–19.

Justice Brandeis dissented, arguing in favor of recognizing an entrapment defense. His premise was that courts have both the authority and responsibility not to partake in the disreputable conduct of other agents of government and thus should not preside over the prosecutions of entrapped defendants:

> The obstacle to the prosecution lies in the fact that the alleged crime was instigated by officers of the government; that the act for which the government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature. If [the defendant] is guilty … , it is because he yielded to the temptation presented by the officers. *Their conduct is not a defense to him.* For no officer of the government has power to authorize the violation of an act of Congress, and no conduct of an officer can excuse the violation. *But it does not follow that the court must suffer a detective-made criminal to be punished. To permit that would be tantamount to a ratification by the government of the officers' unauthorized and unjustifiable conduct.*

*Id.* at 423–24 (Brandeis, J., dissenting) (emphases added) (footnote omitted). For Justice Brandeis, then, the rationale for an entrapment defense was grounded in the court's duty to

ensure the integrity of its own proceedings: "This prosecution should be stopped, not because some right of [the defendant's] has been denied, but in order to protect the government. To protect it from illegal conduct of its officers. To preserve the purity of its courts." *Id.* at 425.

This position attracted ardent supporters, among them Justice Roberts (the first one), *see Sorrells v. United States*, 287 U.S. 435, 454–55 (1932) (Roberts, J., concurring in part and dissenting in part); Justices Frankfurter, Douglas, Harlan, and Brennan, *see Sherman v. United States*, 356 U.S. 369, 380 (1958) (Frankfurter, J., concurring, joined by Douglas, Harlan, and Brennan, J.J.); and later on Justices Stewart and Marshall, *see United States v. Russell*, 411 U.S. 423, 439 (1973) (Stewart, J., joined by Brennan and Marshall, JJ., dissenting); *Hampton v. United States*, 425 U.S. 484, 496 (1976) (Brennan, J., joined by Stewart and Marshall, JJ., dissenting); *Mathews v. United States*, 485 U.S. 58, 67 (1988) (Brennan, J., concurring).

But when the Court eventually adopted the entrapment defense in *Sorrells v. United States*, Justice Brandeis's rationale did not carry the day. *Sorrells* involved a Prohibition-era prosecution for possession and sale of whiskey. An undercover government agent pressured the defendant into providing him with liquor. The agent was introduced to the defendant by a common friend and exploited their shared status as veterans of World War I in an effort to persuade the defendant to get some alcohol. The defendant initially resisted the agent's repeated appeals to camaraderie. When the defendant finally re-lented—after the fifth request, by one witness's account—he left the scene and returned a few minutes later with a half-

gallon of whiskey. Testimony of other witnesses suggested that the defendant had no existing ties to the bootlegging business.

The Supreme Court reversed the trial court's refusal to submit the issue of entrapment to the jury, but expressly rejected the "judicial integrity" justification for the defense:

> We are unable to approve the view that the court, although treating the statute as applicable despite the entrapment, and the defendant as guilty, has authority to grant immunity, or to adopt a procedure to that end. It is the function of the court to construe the statute, not to defeat it as construed. Clemency is the function of the Executive. … Where defendant has been duly indicted for an offense found to be within the statute, and the proper authorities seek to proceed with the prosecution, the court cannot refuse to try the case in the constitutional method because it desires to let the defendant go free.

287 U.S. at 449–50. Instead, the Court based its decision on a loose (some might say implausible) theory of statutory interpretation:

> We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them. We are not

> forced by the letter to do violence to the spirit
> and purpose of the statute.

*Id.* at 448. This rationale endured despite repeated attacks from the Brandeis camp. *See Hampton*, 425 U.S. at 490; *Russell*, 411 U.S. at 432–33; *Sherman*, 356 U.S. at 372.

The debate over the justification for the entrapment defense is not merely academic; it determined the elements of the doctrine and even now has important practical implications for how the defense is litigated. Most importantly, the Court's choice of rationale eventually determined the content of the defense and the priority and weight given its constituent parts.

Recall that the ground of principle underlying the Brandeis view was that courts have the authority and responsibility to protect the integrity of the judicial process from the corrupting influence of disreputable police conduct that *creates* rather than detects and captures criminals. Disreputable police conduct is disreputable regardless of the characteristics of the defendant, and the doctrinal test favored by the Brandeis camp reflected this conception. As articulated by Justice Frankfurter: "[The] test [for entrapment] shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime." *Sherman*, 356 U.S. at 384. This "objective" test held sway with almost everyone who agreed with Brandeis that the entrapment defense is rooted in the need for courts to protect their own integrity.

But because the Court ultimately grounded the defense in statutory interpretation—the premise that Congress could not

possibly have intended to criminalize conduct instigated by government agents—a different test emerged, one that placed decisive weight on the defendant's predisposition. Hence the doctrine that the defense of entrapment consists of *two* elements—government inducement and the defendant's lack of predisposition—with predisposition standing as the "principal element." *Russell*, 411 U.S. at 433. The relationship between this "subjective" test and the statutory-interpretation rationale is not entirely clear, but the basic idea seems to be that Congress could not have intended to criminalize the conduct of "otherwise innocent" persons (i.e., those not "predisposed") who were ensnared by government ploys.

The adoption of the statutory-interpretation rationale also dictated whether the entrapment defense is a question for the judge or the jury. Judge Friendly neatly explained the point:

> The Supreme Court has long been divided as to who should decide [the entrapment] issue, the majority holding for the jury and a strong minority for the judge. The view of the *Sorrells* majority [that entrapment is a jury question] followed logically from its concept that a case of entrapment was implicitly excepted from the statutory definition of the crime; the minority's view flowed with equal logic from its concept that the defense was for the protection of the court's "own functions and the preservation of the purity of its own temple."

*United States v. Riley*, 363 F.2d 955, 957 (2d Cir. 1966) (quoting *Sorrells*, 287 U.S. at 457 (Roberts, J., concurring) (citations

omitted)). The majority view won out; it's now well established that entrapment is a jury question.

### 2. *Elaboration*

*Sorrells* established that the defendant may raise an entrapment defense and the test for entrapment had something to do with the defendant's characteristics and the circumstances surrounding the government's undercover operation. But the doctrine was skeletal and details had to be hammered out. Much of this was accomplished in a single case, albeit one that involved two trials and several appeals.

Joseph Sherman was a recovering heroin addict. *Sherman*, 356 U.S. at 371, 373. His record included a 1942 conviction for narcotics distribution and a 1946 conviction for possession of narcotics. *Id.* at 375. In the summer and fall of 1951, he was working to kick the habit with the aid of a Dr. Grossman, when by chance he met another of Grossman's patients, one Kalchinian. *Id.* at 371. Federal agents caught Kalchinian dealing drugs and recruited him as an informant; his task was "to go out and try to induce a person to sell narcotics." *United States v. Sherman*, 200 F.2d 880, 881 (2d Cir. 1952). So when Kalchinian crossed paths with Sherman at a pharmacy where both were waiting to have prescriptions filled, Kalchinian started a campaign to persuade Sherman to help him obtain heroin. 356 U.S. at 371. Claiming to be suffering from withdrawal, he repeatedly asked Sherman for help finding the drug; Sherman repeatedly refused. *Id.* After a number of these requests, Sherman acquiesced and several times obtained quantities of

the narcotic, which he shared with Kalchinian in exchange for half the purchase price, plus cab fare and other expenses. *Id.*; 200 F.2d at 881. Sherman was arrested and charged with selling narcotics. 356 U.S. at 370.

The first time the case went to trial, the jury rejected Sherman's entrapment defense. On appeal he challenged the entrapment jury instruction and also argued that the district court should have found entrapment as a matter of law. Writing for the court, Judge Learned Hand agreed that instructional error had occurred and warranted a new trial. What is most significant about the Second Circuit's opinion is that Judge Hand gave the entrapment defense its two formal elements: "[I]n [cases of entrapment,] two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; [and] (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence." 200 F.2d at 882.

A second jury convicted Sherman. He again complained that the court should have directed a verdict in his favor, and this time his appeal went all the way to the Supreme Court. The Court agreed that the evidence established entrapment as a matter of law. *Sherman*, 356 U.S. at 373. Three aspects of the Court's opinion deserve note.

First, the Court firmly rejected the proposal of the concurring justices to abandon the subjective test of *Sorrells* and adopt the objective test under which a defendant's predisposition is irrelevant. *Id.* at 376; *see also id.* at 378–85 (Frankfurter, J.,

concurring). Second, the Court implicitly endorsed Judge Hand's two-element formula:

> To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in *Sorrells*. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an appropriate and searching inquiry into his own conduct and predisposition as bearing on his claim of innocence.

*Id.* at 372–73 (internal quotation marks omitted).

The last point concerns the Court's treatment of Sherman's narcotics convictions. During the second trial, the government introduced the convictions to show that Sherman was predisposed to commit the crime. At the time of the charged conduct, the convictions were five and nine years old, respectively. *Id.* at 375. The Court found the passage of time significant, holding as a matter of law that the two convictions were insufficient to prove that Sherman "had *a readiness to sell narcotics at the time Kalchinian approached him*, particularly when we must assume from the record he was trying to overcome the narcotics habit at the time." *Id.* at 375–76 (emphasis added).

This aspect of the case is important in several respects. The premise is that predisposition is not an immutable characteristic or one-way ratchet. Past convictions for similar conduct may show predisposition, but only if reasonably close in time

to the charged conduct, and even then only in combination with other evidence tending to show predisposition. More abstractly, the Court's decision implies that predisposition requires more than a mere desire, urge, or inclination to engage in particular conduct, for surely Sherman was "predisposed" to obtain and share heroin with a fellow addict in that sense. The Court used the word "readiness" and amplified the point later on in the opinion; the Court explained that the predisposition inquiry focuses on whether the defendant "otherwise would … have attempted" the crime without government intervention. *Id.* at 376.

In other words, predisposition is chiefly probabilistic, not psychological. *See United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc) (explaining that a predisposed person is one who "is likely to commit a particular type of crime without being induced to do so by government agents" so that "by arranging for him to commit it now, in circumstances that enable the government to apprehend and convict him, the government punishes or prevents real criminal activity").

### 3. *Entrenchment and Refinement*

The Supreme Court's later forays into the entrapment doctrine represent entrenchment and refinement rather than innovation. Three cases are important for present purposes. In *United States v. Russell*, the Court held that entrapment has no constitutional dimension; it is a common-law defense, not a requirement of due process. 411 U.S. at 430. *Russell* also confirmed that "the *principal* element in the defense of entrap-

ment [i]s the defendant's predisposition to commit the crime," *id.* at 433 (emphasis added), and that a jury finding of predisposition is "fatal to [a] claim of entrapment." *Id.* at 436.

*Mathews v. United States* established that a defendant who denies one or more elements of the crime may raise an entrapment defense. 485 U.S. at 63–66. On the way to this holding, the Court confirmed that entrapment is a question of fact for the jury, *id.* at 63, and explained that the defendant "is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment," *id.* at 62.

*Jacobson v. United States* is the Court's most recent entrapment case and requires more unpacking. In February 1984, Keith Jacobson, a Nebraska farmer, ordered several publications containing child pornography from a California adult bookstore, although he testified that he didn't realize they contained child pornography when he placed the mail order. 503 U.S. 540, 542–44 (1992). This conduct was not a federal crime at the time, but three months later Congress passed the Child Protection Act of 1984 criminalizing the receipt through the mail of visual depictions of children engaged in sexually explicit conduct. *Id.* After finding Jacobson's name on the bookstore's mailing list, the government repeatedly sent him fake leaflets and other solicitations from fictional organizations promoting the idea that child pornography is acceptable, that efforts to ban it were illegitimate, and offering various items for sale. *Id.* at 543–48. This campaign continued for more than two years. In March 1987 Jacobson ordered a publication from

a catalog sent by the government; federal agents made a controlled delivery and arrested him. *Id.*

Jacobson was indicted and tried for violating the Act, and the jury rejected his entrapment defense. *Id.* at 547–48. The Supreme Court reversed, holding that the government failed as a matter of law to prove that Jacobson was predisposed to purchase illegal child pornography. *Id.* at 553–54. To reach this conclusion, the Court refined what it means for a person to be "predisposed" to commit a crime.

A conceptual problem in entrapment doctrine is that the mere fact that the defendant committed the crime suggests that he was predisposed to commit it—or so it was commonly thought. *Jacobson* modified this understanding. But first, the Court reinforced the idea that "where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Id.* at 550. In *Jacobson*, however, there was something more. Although the defendant readily accepted the government's solicitation to purchase child pornography, he did so only after the government had spent more than two years bombarding him with material insisting that child pornography is perfectly acceptable and encouraging him to purchase it.

The dissenters thought that was enough to show the defendant's predisposition *at the time he accepted the government's offer*. *See id.* at 556 (O'Connor, J., dissenting). For the majority, however, the relevant question was whether the

defendant was predisposed *prior to* the government's initial contact:

> Petitioner's ready response to these solicita-
> tions cannot be enough to establish beyond
> reasonable doubt that he was predisposed, *prior*
> *to the* [g]*overnment acts intended to create predispo-*
> *sition*, to commit the crime of receiving child
> pornography through the mails. The evidence
> that petitioner was ready and willing to commit
> the offense came only after the [g]overnment had
> devoted 2½ years to convincing him that he had
> or should have the right to engage in the very
> behavior proscribed by law. Rational jurors
> could not say beyond a reasonable doubt that
> petitioner possessed the requisite predisposition
> *prior to the* [g]*overnment's investigation* and that it
> existed *independent* of the [g]overnment's many
> and varied approaches to petitioner.

*Id.* at 553 (emphases added) (citation omitted).

*Jacobson* thus establishes that although the ready and willing acceptance of the government's offer to commit a crime on customary terms may indicate predisposition, it only does so if acceptance occurs when the offer is first made, or soon thereafter, without the need for other persuasion by the government's agents. *Jacobson* also makes explicit what was only implicit in *Sherman*: that a person is not predisposed to commit a crime simply because he has the urge or inclination to do so. If the defendant's interest in child pornography alone

made him "predisposed," the outcome in *Jacobson* cannot be explained or defended.

Finally, the Court tied the concept of predisposition to the rationale for the entrapment doctrine: "Law enforcement officials go too far when they 'implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute.'" *Id.* at 553 (quoting *Sorrells*, 287 U.S. at 442). Put more succinctly, entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Id.* at 553–54.

### B. Synthesizing the Doctrine: Inducement, Predisposition, and the Relationship Between the Two

It should be clear from this trip through the Supreme Court's key entrapment cases that although the defense has two distinct elements—government inducement and lack of predisposition—the elements are conceptually related. *See Mathews*, 485 U.S. at 63 (explaining that the defense has "two *related* elements: government inducement of the crime, and a lack of predisposition on the part of the defendant" (emphasis added)). We addressed the relationship twenty years ago in our en banc decision in *Hollingsworth*. There we noted that the two elements of the entrapment defense are formally distinct but related in the sense that inducement is "evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that

he was predisposed to commit the crime in question." *Hollingsworth*, 27 F.3d at 1200.

Our cases since then, however, have given conflicting guidance about the meaning of "inducement" and "predisposition" and the relationship between the two. One specific area of confusion relates to a fundamental principle in entrapment law that the government's offer of a run-of-the-mill opportunity to commit the charged crime isn't entrapment. Where does this principle fit in the two-element framework and what role does it play?

As a doctrinal limitation on the availability of the entrapment defense, this principle has been around from the beginning. *See Sorrells*, 287 U.S. at 441 ("It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution."); *see also Mathews*, 485 U.S. at 66 ("[E]vidence that [g]overnment agents merely afforded an opportunity or facilities for the commission of the crime would be insufficient to warrant … an [entrapment] instruction."). Although this proposition enjoys widespread acceptance, the circuits are divided about where to locate it within the inducement/predisposition structure. The point has practical significance for how the defense is litigated.

The Second Circuit folds the principle into the analysis of predisposition. This choice follows by default from the circuit's broad definition of inducement. In *United States v. Riley*, the Second Circuit held that the entrapment doctrine's "first element [inducement] goes simply to the [g]overnment's initiation of the crime and not to the degree of pressure

exerted." 363 F.2d at 958. This expansive understanding of inducement encompasses almost *any* government solicitation of the crime, which in turn establishes a very light trigger for the defense and requires an inquiry into predisposition even in cases in which the government's agents simply furnished the ordinary opportunity to commit the crime without additional efforts at persuasion. *See id.* at 958–59; *see also United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006) (describing the defendant's burden of showing inducement as "relatively slight," requiring only that "the government initiated the crime" (internal quotation marks omitted)). As the D.C. Circuit observed in rejecting the Second Circuit's approach, "[t]he practical effect of *Riley* is to require something more than government solicitation or initiation, but to do so in terms of predisposition rather than in terms of inducement." *United States v. Burkley*, 591 F.2d 903, 913 (D.C. Cir. 1978).

The D.C. Circuit, in contrast, defines inducement as requiring more than mere government initiation or solicitation of the crime: "Inducement … [is] … persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship[,] … [or other] government conduct that would create a risk of causing an otherwise unpredisposed person to commit the crime charged." *Id.* at 913–14. By defining inducement more restrictively, the D.C. Circuit situates the "ordinary opportunity" limiting principle on the inducement side of the analysis, effectively foreclosing the entrapment defense for routine stings without the need to inquire into evidence of the defendant's predisposition. *See id.* (describing the evidentiary foundation necessary for an entrapment instruction).

Most circuits follow this understanding of inducement. *See, e.g., United States v. Stephens*, 717 F.3d 440, 444 (5th Cir. 2013) (explaining that inducement requires governmental involvement "more substantial than simply providing an opportunity or facilities to commit the offense"); *United States v. Vincent*, 611 F.3d 1246, 1250 (10th Cir. 2010) ("Evidence that the government initiated the contact with the defendant, proposed the crime, or solicited or requested the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement."); *United States v. Myers*, 575 F.3d 801, 806 (8th Cir. 2009) (same); *United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004) ("[T]o be entitled to an entrapment instruction, a defendant must produce … evidence of 'inducement,' defined as solicitation *plus* some overreaching or improper conduct on the part of the government.").[4]

This approach makes sense. Where the government's agents merely initiate contact with the defendant, solicit the crime, or furnish an opportunity to commit it on customary terms, the government has not "induced" the crime within the meaning of the entrapment doctrine and the defense should be unavailable without the need for a more complex inquiry into evidence of predisposition.

---

[4] For a time the First Circuit followed a third approach, collapsing the two formal elements of entrapment into a single inquiry, albeit one that looked for evidence of "corrupting" conduct by the government *and* "unreadiness" on the part of the defendant (i.e., lack of predisposition). *See United States v. Kadis*, 373 F.2d 370, 373 (1st Cir. 1967); *see also United States v. Espinal*, 757 F.2d 423, 425–26 (1st Cir. 1985). Although *Kadis* has not been overruled, more recent cases follow the traditional two-element framework. *See, e.g., United States v. Tom*, 330 F.3d 83, 89 (1st Cir. 2003).

Our cases have not always been clear about this point. Some opinions seem to situate the "ordinary opportunity" limiting principle within the predisposition element, though without saying so in so many words. *See, e.g.*, *United States v. Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993) ("A predisposed person is one 'who takes advantage of an ordinary opportunity to commit criminal acts—not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person … .'" (quoting *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991))). Others put the principle on the inducement side of the analysis. *See, e.g.*, *United States v. Pillado*, 656 F.3d 754, 764 (7th Cir. 2011) ("We recognize that where there is insufficient evidence of inducement—either because there is no such evidence at all, *or because the government did nothing more than offer a standard market deal in a sting*— there is no need to consider predisposition." (emphasis added)); *id.* (stating that inducement does not occur where "the government's actions simply provided an opportunity for a person who was already ready and willing to commit the offense"); *United States v. Johnson*, 32 F.3d 304, 308 (7th Cir. 1994).

The conflicting strains in our caselaw may be attributable to our lack of a settled definition of "inducement." It's clear that we do not subscribe to the Second Circuit's expansive understanding of the term; our cases reflect the principle that "the mere solicitation by the government's agent by itself is not sufficient" to show inducement. *United States v. Blackman*, 950 F.2d 420, 424 (7th Cir. 1991); *see also United States v. Gunter*, 741 F.2d 151, 154 (7th Cir. 1984). Our decision in *Pillado* hinted in a definitional direction by suggesting that inducement is

something more than "offer[ing] a standard market deal in a sting." 656 F.3d at 764.

But the focus in *Pillado* was on predisposition; the decision did not give further guidance on the meaning of inducement. We take the opportunity to do so now. Inducement requires more than government solicitation of the crime; the fact that the government's agents initiated contact with the defendant and offered an ordinary opportunity to commit the charged crime is insufficient to raise an entrapment defense. "[T]he term 'ordinary' in this context … mean[s] something close to what unfolds when a sting operation mirrors the customary execution of the crime charged." *Id.* at 765. Something more is required, either in terms of the character and degree of the government's persistence or persuasion, or the nature of the enticement or reward.

A second area of confusion is whether a predisposed defendant may assert an entrapment defense if the government inducement is strong enough. *Pillado* suggests as much: "[W]hen the record reveals that a defendant was predisposed to commit the crimes charged, she is not entitled to an entrapment instruction unless she can show that the government provided an opportunity to commit the crime that was out of the ordinary." *Id.* at 766; *see also id.* at 764 ("Whether a defendant is predisposed to commit the crime charged informs the nature and level of government inducement that must be identified to warrant an entrapment instruction."); *see also id.* at 765 ("The upshot is that once a court has concluded that a person was predisposed to commit a crime, a defendant must do more to earn the [entrapment] instruction than assert that

the government provided an ordinary opportunity to commit the crime; he must show extraordinary inducement.").

Earlier opinions, however, say otherwise. *See, e.g.*, *United States v. Sanchez*, 984 F.2d 769, 773 (7th Cir. 1993) ("The entrapment analysis ends without inquiry into government inducement if the defendant was predisposed to commit the charged conduct."); *United States v. Kaminski*, 703 F.2d 1004, 1007 (7th Cir. 1983) ("[T]he defense of entrapment is not available to a predisposed defendant … ."). More importantly, the Supreme Court has said otherwise: "We [have] ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established." *Hampton*, 425 U.S. at 488–89 (Rehnquist, J., plurality opinion); *see also Russell*, 411 U.S. at 436 (explaining that the defendant's concession that "the jury finding as to predisposition was supported by the evidence is … fatal to his claim of entrapment").

This principle is a corollary of the Court's settled doctrine that entrapment rests on a subjective judgment about the defendant's predisposition; if he was predisposed to commit the crime, he cannot have been entrapped. It follows that the quantum of inducement necessary to raise the defense does not vary depending on whether the defendant was predisposed because *no* level of inducement can overcome a finding of predisposition. The nature and degree of the government's inducement may, however, affect the jury's determination of predisposition; we will return to this point in a moment.

A related complication involves the role of "extraordinary inducement." This phrase appears throughout our entrapment cases, but we have not used it consistently. Some of our opinions say that the entrapment defense requires a threshold showing of "extraordinary" government inducement. *See, e.g.*, *United States v. Mandel*, 647 F.3d 710, 718 (7th Cir. 2011); *United States v. Millet*, 510 F.3d 668, 676–77 (7th Cir. 2007); *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006). Others explain that "[t]he government's inducement does not always need to be 'extraordinary' to satisfy the inducement element; even minor government inducements may be sufficient in some cases." *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012) (second internal quotation marks omitted); *see also Pillado*, 656 F.3d at 765–76 (to the same effect).

Perhaps "extraordinary" in this context means only that the government's conduct must consist of something more than a simple offer of an opportunity to commit the crime on customary terms. If that's how the qualifier "extraordinary" is understood and applied, then it works just fine. But as we've noted, the concept of "extraordinary inducement" has acquired a much stronger meaning in some of our cases, and this sets the bar for entrapment too high. The touchstone of an illegitimate inducement is that it creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's persuasion. The conduct of the government's agents need not be "extraordinary" to create this risk. As we explained in *Pillado*, "subtle, persistent, or persuasive" conduct by government agents or informants may qualify as an illegitimate inducement. 656 F.3d at 765. *Pillado* also cautioned

against "taking the adjective 'extraordinary' out of context to divine a new legal standard." *Id.* at 765–66.

Retracing the Supreme Court's key entrapment cases may help illuminate the problem and point toward a solution. In *Sorrells* the Court found that an entrapment instruction was warranted even though the defendant was promised no extravagant profit for obtaining alcohol for the undercover informant; the informant's persistent appeal to military camaraderie qualified as a potentially entrapping inducement. 287 U.S. at 441. In *Sherman* the Court found entrapment as a matter of law even though the defendant was offered little more than reimbursement for his costs if he would obtain heroin; the inducement there consisted of repeated requests from an informant posing as a fellow recovering addict who had fallen off the wagon. 356 U.S. at 371. In *Jacobson* the Court found entrapment as a matter of law where the defendant took up a relatively standard offer to purchase child pornography; the inducement in that case was a two-year campaign of fake mail-order entreaties conditioning the defendant to believe that child porn was acceptable and encouraging him to purchase it. 503 U.S. at 546–47.

Nothing about the transactions at issue in *Sorrels*, *Sherman*, and *Jacobson* can be characterized as "extraordinary" as that term is colloquially understood. The entrapment defense was available because the government's solicitation of the crime was accompanied by subtle and persistent artifices and devices that created a risk that an otherwise law-abiding person would take the bait. The ploys were not "extraordinary" in the strong sense of that word, but they exceeded the typical sting in which

the government merely offers an ordinary opportunity to commit a crime, without more.

\*   \*   \*

Clarity and consistency would be served if we made a fresh start with a definition of inducement. We hold that inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts. The "other conduct" may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

\*   \*   \*

Moving on to predisposition, our circuit has long used a nonexclusive list of five factors to determine whether the defendant was predisposed to commit the charged crime. Formally adopted in 1983, *see Kaminski*, 703 F.2d at 1008, our test includes the following factors:

(1) the defendant's character or reputation;
(2) whether the government initially suggested
the criminal activity; (3) whether the defendant
engaged in the criminal activity for profit;
(4) whether the defendant evidenced a reluctance
to commit the offense that was overcome by
government persuasion; and (5) the nature of the
inducement or persuasion by the government.

*Pillado*, 656 F.3d at 766; *see also United States v. Hall*, 608 F.3d
340, 343 (7th Cir. 2010); *Santiago-Godinez*, 12 F.3d at 728. No one
factor controls, and the "most significant is whether the
defendant was reluctant to commit the offense." *Pillado*,
656 F.3d at 766.

Multifactor tests are common in our law but they can be
cryptic when unattached to a substantive legal standard, as this
one is. Knowing what factors to look *at* is useless unless one
knows what to look *for*. Without a legal definition of predispo-
sition, jurors are left to weigh the listed factors in the abstract,
or perhaps to weigh them against an intuitive understanding
of the term. Some concepts in our law are appropriately left to
the common sense and collective wisdom of the jury. *See
United States v. Hatfield*, 591 F.3d 945, 949–50 (7th Cir. 2010)
(explaining that the term "reasonable doubt" is best left
undefined); *United States v. Glass*, 846 F.2d 386, 387 (7th Cir.
1988) ("Jurors know what is 'reasonable' and are quite familiar
with the meaning of 'doubt.'"). The concept of predisposition
is not so well understood that it belongs in this category. Our
multifactor test for predisposition would be more useful if we
defined the term.

Again we take our cues from the Supreme Court's key entrapment cases. We know from *Sherman* and *Jacobson* that predisposition requires more than a mere desire, urge, or inclination to engage in the charged criminal misconduct. Sherman surely had an inclination or urge to obtain narcotics; he was struggling to overcome an addiction, after all. *Sherman*, 356 U.S. at 371. If the mere urge was enough to make him predisposed to sharing drugs, the outcome of the case would have been different. Similarly, Jacobson may have been predisposed in the sense of having an inclination to view child pornography, but the Supreme Court rejected that understanding of predisposition:

> Petitioner's responses to the many communications prior to the ultimate criminal act were *at most indicative of certain personal inclinations*, including a predisposition to view photographs of preteen sex and a willingness to promote a given agenda by supporting lobbying organizations. Even so, petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails. Furthermore, *a person's inclinations and fantasies … are his own and beyond the reach of government … .*

*Jacobson*, 503 U.S. at 551–52 (emphases added) (footnote and internal quotation marks omitted). In short, a person who resists his baser urges is not "predisposed" simply because he experiences them.

This conclusion follows from the animating principles of the entrapment doctrine. A legitimate sting takes an actual criminal off the streets and thus reduces the actual crime rate. *See United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986). The entrapment defense guards against government overreach in this context, "reflect[ing] the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Hollingsworth*, 27 F.3d at 1203. When government agents "tempt[] [a] person to commit a crime that he would not otherwise have committed, punishing him will not reduce the crime rate; it will merely deflect law enforcement into the sterile channel of causing criminal activity and then prosecuting the same activity." *Manzella*, 791 F.2d at 1269.

Predisposition thus refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means. In *Sherman* the Court asked whether the defendant "otherwise would … have attempted" the crime absent the government's effort to beguile him, 356 U.S. at 376, and concluded that he would not have. The Court used the word "readiness": It was the government's burden "to prove petitioner had a *readiness* to sell narcotics at the time [the informant] approached him." *Id.* at 375 (emphasis added). In *Jacobson* the Court described entrapment as "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." 503 U.S. at 553–54.

Our en banc decision in *Hollingsworth* helpfully described the concept of predisposition this way:

> The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is *likely* that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation.

27 F.3d at 1200 (emphasis added). But we tacked on an important caveat: "We do not wish to be understood as holding that lack of *present* means to commit a crime is alone enough to establish entrapment if the government supplies the means." *Id.* at 1202. Instead, a defendant who lacks the means to commit the crime when first approached by the government is nonetheless predisposed if he "had the idea for the crime all worked out and lacked merely the present means to commit it, and if the government had not supplied [the means,] someone else very well might have." *Id.* at 1203. Put slightly differently, a predisposed person is *not* one who "on his own might, under some conceivable set of circumstances, commit the crime." *Burkley*, 591 F.2d at 916. Rather, a predisposed person is one who "is presently *ready and willing* to commit the crime." *Id.*

Importantly, predisposition is measured *prior to* the government's attempts to persuade the defendant to commit the crime. *See United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995) (explaining that a predisposed defendant is one who "was disposed to commit the crime prior to being approached by government agents"); *Kaminski*, 703 F.2d at 1008

("[P]redisposition is, by definition, the defendant's state of mind and inclinations *before his initial exposure to government agents*." (internal quotation marks omitted)). *Jacobson* specifically confirmed this point. *See* 503 U.S. at 553 ("Rational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition *prior to* the [g]overnment's investigation and that it existed *independent* of the [g]overnment's many and varied approaches to petitioner." (emphases added)). In other words, "a criminal predisposition induced by government action cannot be used to defeat an entrapment defense." *Hollingsworth*, 27 F.3d at 1201.

We are not suggesting that the defendant's conduct after he encountered the government's agents is irrelevant to the determination of predisposition. To the contrary, the defendant's response to the government's offer may be important evidence of his predisposition. *See Kaminski*, 703 F.2d at 1008 (explaining that because "there is little direct evidence of the defendant's state of mind prior to interaction with [g]overnment agents[,] … we must instead rely upon indirect proof available through examination of the defendant's conduct after contact with the agents"). This is where the conceptual overlap between the two elements becomes important: The character and degree of the inducement—and the defendant's reaction to it—may affect the jury's assessment of predisposition. That the defendant eventually agreed to commit the crime in response to the government's efforts does not necessarily prove predisposition, for if the inducement was significant enough to cause even a nonpredisposed person to commit the crime, no inference can be drawn about predisposition from the success of the government's efforts.

It's worth repeating what we said in *Hollingsworth*: The nature of the government inducement is "significant chiefly as evidence bearing on predisposition: the greater the induce-ment, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." 27 F.3d at 1200.

Relatedly, we have long emphasized that evidence of the defendant's reluctance to commit the crime looms large in the analysis of predisposition. *See, e.g., Pillado*, 656 F.3d at 766 (explaining that the most significant factor in predisposition analysis is "whether the defendant was reluctant to commit the offense"); *Hall*, 608 F.3d at 343 (same); *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) (same); *Theodosopoulos*, 48 F.3d at 1444 ("The most important factor is whether the defendant exhibited a reluctance to commit the offense that government agents overcame."); *Kaminski*, 703 F.2d at 1008 (same). Other evidence of the defendant's conduct after the initial contact by the government's agents—for example, his actions or statements during the planning stages of the criminal scheme—also may be relevant to the determination of predisposition. All this evidence must be considered with care, of course; by definition, the defendant's later actions may have been shaped by the government's conduct.

Better evidence of the defendant's predisposition may come from his past conduct. Entrapment is one of the few areas in the criminal law in which past is legitimately considered to be prologue. But is *any* history of criminal misconduct sufficient to make the defendant "predisposed," or must the defendant's

prior crimes be similar to the charged offense? One position is that only a totally law-abiding person may be entrapped; on this view, prior criminal misconduct of any kind makes the defendant "predisposed" to criminality writ large. A contrary view is that even someone with a history of committing one kind of crime may be entrapped into a crime of a substantially different kind or degree.

Although the Supreme Court hasn't spoken directly to this question, the answer is implicit in the Court's entrapment cases, and Judge Hand specifically addressed it in his influential opinion for the Second Circuit in *Sherman*:

> The proof of this [predisposition] may be by evidence of his past offences, of his preparation, even of his "ready compliance." Obviously, it is not necessary that the past offences proved shall be precisely the same as that charged, provided they are *near enough in kind* to support an inference that his purpose included offences *of the sort charged*.

200 F.2d at 882 (emphases added). This point reappears, if only by implication, in the Supreme Court's opinion in *Sherman*. As the Court framed the issue, the relevant inquiry was whether Sherman was "ready and willing *to sell narcotics*"; the Court concluded that "[t]here is no evidence that petitioner himself was *in the trade*." 356 U.S. at 375 (emphases added). Since then, the Court has said that "the principal element in the defense of entrapment [i]s the defendant's predisposition to commit *the* crime"—not just *any* crime. *Russell*, 411 U.S. at 433 (emphasis added).

Our own precedent confirms this understanding of the role of the defendant's criminal history. *See United States v. McGill*, 754 F.3d 452, 458 (7th Cir. 2014) ("[T]he ranks of the 'unwary innocent' are not limited to those whose lives are crime free."); *United States v. Sanders*, 962 F.2d 660, 677 (7th Cir. 1992) (explaining that a defendant was predisposed if he was "willing to commit a crime *like the one charged in the indictment*" (emphasis added) (quotation marks omitted)); *United States v. Townsend*, 555 F.2d 152, 155 n.3 (7th Cir. 1977) ("[E]ven the most habitual offender can be entrapped if the officers use coercive inducement to overbear the defendant's reluctance.").

A related question concerns the timing of the defendant's prior crimes relative to the charged conduct. We return again to *Sherman*, which held that the defendant's prior drug crimes—a nine-year-old conviction for selling drugs and a five-year-old conviction for possession—were insufficient as a matter of law to establish his predisposition to sell drugs. 356 U.S. at 373–77. The Court's conclusion was based in part on the additional fact that Sherman was trying to kick the habit at the time he was approached by the government's informant. *Id.*

The upshot is that although the defendant's criminal history is relevant to the question of his predisposition, it's not *dispositive*. Notwithstanding a checkered past, a defendant may lack the predisposition to commit the charged crime.

\*   \*   \*

To summarize then, a defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have committed it without the government's

intervention, or actively wanted to but hadn't yet found the means. The defendant's predisposition is measured at the time the government first proposed the crime, but the nature and degree of the government's inducement and the defendant's responses to it are relevant to the determination of predisposition. A prior conviction for a similar offense is relevant but not conclusive evidence of predisposition; a defendant with a criminal record can be entrapped.

### C. Procedure

Generally speaking, entrapment is a question for the jury, not the court. *Jacobson*, 503 U.S. at 549; *Mathews*, 485 U.S. at 63; *McGill*, 754 F.3d at 457; *Pillado*, 656 F.3d at 763. As we've explained, the subjective basis of the defense makes entrapment a fact question for the jury to decide "as part of its function of determining the guilt or innocence of the accused." *Sherman*, 356 U.S. at 377; *see also Mathews*, 485 U.S. at 62–63.

Two important procedural questions remain: (1) What is the burden of proof for entrapment and who bears it? (2) Under what circumstances may the court preclude a defendant from asserting the defense at all?

#### 1. *Burden of Proof*

"Where … the defense of entrapment is at issue, … the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by [g]overnment agents." *Jacobson*,

503 U.S. at 548–49. This statement admits of no ambiguity: The government bears the burden, and the level of proof is beyond reasonable doubt. *See also Pillado*, 656 F.3d at 763; *Santiago-Godinez*, 12 F.3d at 728.

The Supreme Court's decision in *Dixon v. United States* did not disturb this allocation of the proof burden. 548 U.S. 1 (2006). Keshia Dixon was charged with receiving a firearm while under indictment and making false statements in connection with the acquisition of a firearm; she raised a defense of duress. *Id.* at 4. The district court required her to prove the defense by a preponderance of the evidence; she urged the Supreme Court to hold that the government must disprove duress beyond a reasonable doubt. *Id.* at 6. The Court declined to do so, holding instead that because the defense of duress does not negate an element of the offense, neither the Due Process Clause nor the federal common law requires the government disprove the defense beyond a reasonable doubt. *Id.* at 7–16. In the absence of a statute specifically addressed to the question, the Court assumed that Congress defined the charged crimes with the common-law understanding of affirmative defenses in mind. *Id.* at 12–17. In the case of duress, the Court assumed that Congress incorporated the traditional view that the defendant bears the burden of proving the defense by a preponderance of the evidence. *Id.*

Congress has never addressed the defense of entrapment. Unlike other common-law defenses, however, established entrapment doctrine places the burden squarely on the

government to disprove the defense beyond a reasonable doubt. Nothing in *Dixon* undermines this settled principle.[5]

One final point on the burden of proof before we move on: We have consistently held that the government can defeat the entrapment defense at trial by proving *either* that the defendant was predisposed to commit the crime *or* that there was no government inducement. *See, e.g., Santiago-Godinez*, 12 F.3d at 728; *Gunter*, 741 F.2d at 153 (explaining that the prosecution must "prove beyond a reasonable doubt that the defendant was predisposed *or* that there was no [g]overnment induce-ment" (emphasis added)); *see also Burkley*, 591 F.2d at 916 (explaining that the government "need not, though it may, prove that there was no government inducement of or partici-pation in the crime"). This is a fair reading of the two-element structure of the defense; no one here has questioned this understanding of the government's burden.

---

[5] We spoke too broadly in *United States v. Orr* when we said that the burden of persuasion "is placed squarely on the shoulders of the defendant claiming entrapment." 622 F.3d 864, 868 (7th Cir. 2010). The defendant there insisted that he was entitled to judgment of acquittal based on an entrap-ment argument that he raised for the first time on appeal. *Id.* We of course rejected that argument. *Id.* ("The district court did not err by denying Orr's motion to acquit based on a defense he never asserted … ."). *Orr* stands for the proposition that the defendant has the initial burden of raising the entrapment defense and must do so before or at trial. The question of the burden of persuasion was not before the court.

**2.** *Raising the Entrapment Defense*

Because entrapment is a fact question on which the government bears the burden of proof, the defendant is entitled to a jury instruction on the defense "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews*, 485 U.S. at 62; *see also Plowman*, 700 F.3d at 1057; *Theodosopoulos*, 48 F.3d at 1444; *Santiago-Godinez*, 12 F.3d at 727. We have held that to obtain a jury instruction and shift the burden of disproving entrapment to the government, the defendant must proffer evidence on both elements of the defense. *See Plowman*, 700 F.3d at 1057; *Pillado*, 656 F.3d at 763; *Santiago-Godinez*, 12 F.3d at 728. But this initial burden of production is not great. An entrapment instruction is warranted if the defendant proffers "some evidence" that the government induced him to commit the crime and he was not predisposed to commit it. *Pillado*, 656 F.3d at 764 ("[A] defendant must proffer some evidence on both elements of the entrapment defense to warrant the instruction … ."); *see also Theodosopoulos*, 48 F.3d at 1445; *Gunter*, 741 F.2d at 153. Put another way, "[a]lthough more than a scintilla of evidence of entrapment is needed before instruction on the defense becomes necessary, the defendant need only point to evidence in the record that would allow a rational jury to conclude that he was entrapped." *McGill*, 754 F.3d at 457; *see also Santiago-Godinez*, 12 F.3d at 727.

*Mathews* used the phrase "sufficient evidence" to describe the defendant's burden of production, but this should not be understood as an invitation to the court to weigh the evidence or assess the credibility of witnesses. As with any other factual

question, the ultimate merit of the entrapment defense is entrusted to the jury. Accordingly, assessing "sufficiency" in this context does not mean that the judge weighs the evidence or decides whether the defense is believable. "[W]here there is at least some evidence [of entrapment] in the record, it is for the jury … to weigh conflicting testimony, to draw reasonable inferences from the evidence[,] and to make credibility determinations." *Theodosopoulos*, 48 F.3d at 1445.

As a practical matter, entrapment is now regularly litigated as it was here: before trial, on the government's motion in limine to preclude the defense. Though this practice is permissible, *see Plowman*, 700 F.3d at 1057; *Santiago-Godinez*, 12 F.3d at 727–28, it carries an increased risk that the court will be tempted to balance the defendant's evidence against the government's, invading the province of the jury. In ruling on a pretrial motion to preclude the entrapment defense, the court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it. *See Plowman*, 700 F.3d at 1057; *Blassingame*, 197 F.3d at 279. This important point is sometimes obscured, subtly raising the bar for presenting entrapment evidence at trial.

One final observation before we consider Mayfield's case: The two elements of the entrapment inquiry are not equally amenable to resolution before trial. Predisposition rarely will be susceptible to resolution as a matter of law. Predisposition, as we've defined it, refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means. This probabilistic question is quintessentially factual;

it's hard to imagine how a particular person could be deemed "likely" to do something as a matter of law. The inducement inquiry, on the other hand, may be more appropriate for pretrial resolution; if the evidence shows that the government did nothing more than solicit the crime on standard terms, then the entrapment defense will be unavailable as a matter of law.

### D. Application

We now return to Mayfield's case. Did he proffer enough evidence to create an entrapment issue for trial? Accepting the facts in his pretrial proffer as true and drawing reasonable inferences in his favor, we conclude that he did.

Mayfield's proffer contains sufficient evidence from which a reasonable jury could find that the government induced him to commit the crime. Potts targeted Mayfield at a moment of acute financial need and against a backdrop of prolonged difficulty finding permanent, family-supporting work. Potts also appealed to Mayfield's friendship and camaraderie and to their common struggle as convicted felons trying to make a living. Appeals of this sort are among the oldest tactics recognized as forms of government inducement. *See, e.g.*, *Sorrells*, 287 U.S. at 441. Moreover, Potts gave Mayfield money in order to create a debt that he knew Mayfield would be unable to repay and then exploited that debt by alluding to his status as a member of the Gangster Disciples. Drawing inferences in Mayfield's favor, this action was arguably calculated to convey an implied threat of violence if the debt was not repaid. Threats obviously qualify as inducements. Finally, Potts pestered Mayfield over a substantial period of

time; a reasonable jury could find that this persistent pressure amounted to harassment.

We do not need to decide whether any of these tactics standing alone would suffice to establish inducement; some of them almost certainly would not. But together, they are enough to permit a reasonable jury to conclude that the government induced Mayfield to commit the crime. That is, a rational jury could find that the government's actions created a risk that a person who otherwise would not have committed the crime would do so in response to the government's efforts.

It's true that when push came to shove, Potts offered Mayfield an opportunity to participate in what was apparently a typical stash-house robbery, at least as far as the record shows. If the government had done nothing more than make this opportunity available, then its actions would not qualify as an illegitimate inducement. But the government did more; it paired the reward of a stash-house robbery with an extended campaign of persuasion that played on Mayfield's financial need and culminated in a veiled threat of reprisal from a vicious street gang. A rational jury could find that the government induced him to commit the crime.

Mayfield also proffered enough evidence to permit a rational jury to find reasonable doubt about his predisposition to commit the stash-house robbery at the time Potts first approached him with the offer. Mayfield repeatedly rejected Potts's entreaties over the course of several weeks, relenting only when faced with an implied threat that the Gangster Disciples street gang might retaliate against him if he did not repay his debt. Accepted as true, Mayfield's initial reluctance

and continued resistance is substantive evidence that he was not predisposed to commit the crime when Potts first proposed it.

True, the government offered its own evidence that Mayfield had a serious criminal record, and that once he accepted Potts's overture, he recruited a crew and actively participated in planning the scheme, and also bragged about having experience robbing stash houses. However substantial or substantiated the government's evidence may seem to the court, its weight is a question for the jury. If Mayfield had been allowed to present his entrapment evidence at trial, he might have persuaded the jury that it was all a bluff.

As a logical and legal matter, Mayfield's active engagement in the scheme *after* the government's extended efforts to procure his participation has limited bearing on his predisposition when the government first proposed it. If a jury were to conclude that the government's conduct might have ensnared a person who otherwise would not have committed the crime, the fact that Mayfield, once ensnared, actively participated in it doesn't tell us much about his predisposition. *See Evans*, 924 F.2d at 716 (explaining that if the defendant "was indeed entrapped, it is irrelevant that the entrapment was so effective as to make him not only a willing but an eager participant"). Moreover, as we've explained, the trial judge cannot weigh the competing evidentiary proffers and accept the government's as more persuasive than the defendant's. That's exactly what the judge did here, and quite expressly.

Of course, Mayfield can't escape his criminal record, which contains a conviction for armed carjacking. But he proffered

evidence that after his release from prison, he joined antirecidivism programs and found honest work in an effort to go straight and not return to a life of crime. Even without this evidence of rehabilitation, the fact that Mayfield committed a different kind of robbery in the past is not conclusive evidence that he was predisposed to commit *this crime*—a stash-house robbery—when Potts first proposed it. *See Sherman*, 356 U.S. at 375–76.

In the end, the inferences to be drawn from the evidence as a whole are varied and ultimately for the jury. Mayfield proffered enough evidence to defeat the government's motion in limine. The district court should not have precluded him from presenting his entrapment evidence at trial.

### III. Conclusion

To recap, entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it. The two elements of the defense—lack of predisposition and government inducement—are conceptually related but formally and temporally distinct.

The predisposition element focuses on the defendant's circumstances *before* and *at the time* the government first approached him with a proposal to commit the crime. A defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have commit-

ted it without the government's intervention, or actively wanted to but hadn't yet found the means.

As for the inducement element, the fact that the government initiated contact with the defendant, suggested the crime, or created the ordinary opportunity to commit it is not sufficient; something more is required, either in terms of the character and degree of the government's persistence or persuasion, the nature of the enticement or reward, or some combination of these. Conduct by the government's agents amounts to inducement if, considering its character and the factual context, it creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's persuasion.

Procedurally, entrapment is an issue of fact for the jury. The defendant is entitled to present the defense at trial if he shows that some evidence supports it. This initial burden is not great; the defendant must produce some evidence from which a reasonable jury could find government inducement and lack of predisposition. If he can make this showing, the court must instruct the jury on entrapment and the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the charged crime, or alternatively (but less commonly), that there was no government inducement. When the issue is raised before trial on the government's motion to preclude the defense, the court must accept the defendant's factual proffer as true and not weigh it against the government's evidence.

Applying these substantive and procedural principles here, we conclude that Mayfield's proffer was sufficient to overcome

the government's motion in limine. The district court erred by crediting the government's evidence over Mayfield's and precluding him from presenting his entrapment evidence at trial. He is entitled to a new trial.

VACATED and REMANDED.

BAUER, *Circuit Judge,* with whom EASTERBROOK, *Circuit Judge*, joins, dissenting. The gist of my argument against the majority opinion is contained in a footnote addressing the dissent in the panel opinion (now dead) when this case was first before us. I repeat it now:

> The dissent believes that Mayfield was entitled to an entrapment defense. It argues that a jury could have found the government inducement "extraordinary," because stash-house robberies are particularly lucrative compared to other sorts of robberies. The dissent reasons that the inducement would only be extraordinary to a non-veteran stash-house robber, and that it was for the jury to decide if Mayfield had robbed stash houses before. We cannot endorse this analysis. It effectively collapses the inducement and predisposition elements of entrapment and would allow otherwise predisposed criminals to claim entrapment simply because they were entering a new, more lucrative field of crime. Whether a government agent's offer is extraordinary should be considered in light of the terms on which crimes of this sort are typically committed. *See United States v. Pillado*, 656 F.3d 754, 765 (7th Cir. 2011). Nothing in the record suggests that this planned stash-house robbery would be any more lucrative than the typical stash-house robbery. And as we stressed previously, the risk-adjusted rewards for this crime were not so great; Mayfield planned to risk his life and to risk prosecution for murder if he lived.

The record shows the defendant was salivating to commit the crime. The fact that he was exceptionally greedy should not entitle him to an entrapment defense.

EASTERBROOK, *Circuit Judge*, dissenting. I joined Judge Bauer's opinion for the panel, *United States v. Kindle*, 698 F.3d 401 (7th Cir. 2012), and still agree with his views, so I join his dissent from the en banc decision.

My colleagues continue to employ, and extend, the approach adopted by *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994) (en banc). I was not persuaded by *Hollingsworth* at the time (see 27 F.3d at 1211–13; I also joined most of Judge Ripple's dissent, 27 F.3d at 1213–19) and am not persuaded now. *Jacobson v. United States*, 503 U.S. 540 (1992), remains the Supreme Court's most recent analysis of entrapment. We should apply the doctrine as the Justices stated it rather than adopt local elaborations.

Mayfield demonstrated that he was willing to rob stash houses, even at great risk to himself, if the price was right. That he waited until the anticipated gains made the venture attractive does not allow a jury to find entrapment under *Jacobson*'s approach. No ordinarily law-abiding person would have agreed to a plan that, as the venture was described, entailed a considerable risk of violence to others, including the need to deal with the stash house's three armed guards (potentially by killing them), and a substantial risk of injury or death to oneself if the guards could not be overcome. Mayfield contends that he planned to rob only the courier, but even that would have encountered armed resistance. By depicting the robbery as likely to be forcibly resisted, Potts and Gomez ensured that only someone predisposed to violent crime would join the venture. Nothing that Potts or Gomez said to Mayfield implanted, or could have created, a disposi-

tion to commit mayhem in order to reap financial rewards. Mayfield assembled and armed a strike team; the district judge properly treated him as a leader, not (as *Jacobson* requires for entrapment) a person whose will was worn down and finally overborne.